**UNIVERSAL EQUIPMENT CO., an Ohio corporation, Appellant (Defendant),**

**v.**

**STATE of Wyoming By and Through the DEPARTMENT OF ENVIRONMENTAL QUALITY, Appellee (Defendant).**

**No. 92–21.**

Supreme Court of Wyoming.

Oct. 21, 1992.

David D. Freudenthal of Herschler, Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, and Michael K. Yarbrough of Frost and Jacobs, Columbus, Ohio, for appellant.

Joseph B. Meyer, Atty. Gen., Mary B. Guthrie, Steve Jones, Sr. Asst. Attys. Gen., Thomas A. Roan, Asst. Atty. Gen., and Joel M. Vincent of Vincent & Vincent, Riverton, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT * and GOLDEN, JJ.

MACY, Chief Justice.

Appellant Universal Equipment Co. challenges the district court's order requiring it to post an additional performance bond to ensure reclamation of its mine-site buildings and facilities. Appellant contends that the Wyoming Environmental Quality Act (WEQA) does not authorize the Department of Environmental Quality (DEQ) to impose reclamation and bonding requirements for buildings and facilities which were built before the WEQA was enacted.

We affirm.

Appellant raises the following issues:

1. Whether buildings and facilities that existed within a mine permit under the Open Cut [Land] Reclamation Act of 1969 are subject to additional reclamation and bonding requirements under the Environmental Quality Act of 1973 by virtue of converting the original permit to a permit under the EQA of 1973.

2. Whether entry of an order by the District Court directing the payment of reclamation bond proceeds pursuant to a contract which authorized such payments only upon the completion of all reclamation, precluded the Court from later determining that reclamation was not complete and directing the posting of additional bond.

Appellee State of Wyoming restates the issues as:

I. Whether the district court correctly determined that buildings and structures at the Atlantic City Mine are subject to the reclamation and bonding requirements of the Wyoming Environmental Quality Act.

II. Whether the district court has determined that reclamation at the Atlantic City mine is complete.

United States Steel Corporation owned and operated an iron ore mine located near Atlantic City in Fremont County, Wyoming, for many years, first pursuant to a permit issued under the authority of the Open Cut Land Reclamation Act and then, starting in November 1974, under the authority of a WEQA permit. After receiving its WEQA permit, United States Steel continued to operate the mine for several more years until it finally ceased active mining in 1983. Rather than reclaim the mine itself, United States Steel sold the mine and transferred its mining permit to Appellant in January 1985. By accepting the transfer of United States Steel's mining permit, Appellant obtained salvage rights to the on-site mining equipment and materials and assumed responsibility for reclaiming the mine site. As part of the permit transfer, Appellant was required to submit a new reclamation plan and to post a reclamation performance bond of slightly more than $1.8 million.

Beginning in 1985, Appellant contracted with various companies to perform different aspects of the reclamation project, such as engineering and construction. Reclamation activities continued from 1985 until the spring of 1989, when a dispute arose between one of these companies, ARIX Corporation, and Appellant regarding Appellant's failure to pay ARIX for its engineering services. ARIX filed a breach-of-contract action, naming both Appellant and the State of Wyoming, by and through the DEQ, as defendants.

ARIX moved for, and the district court granted, a summary judgment against Appellant for unpaid engineering services.

* Chief Justice at time of oral argument.

To satisfy its judgment, ARIX applied for a writ of postjudgment garnishment against Appellant's reclamation performance bond being held by the DEQ. The State resisted ARIX's motion for a postjudgment garnishment, contending that it could not allow garnishment of the bond until additional reclamation had been completed. In conjunction with its answer resisting a postjudgment garnishment, the State petitioned the district court for a declaratory judgment to determine the responsibilities between the three parties and, of particular importance to this appeal, to determine Appellant's obligation to demolish or make some acceptable use of the mine's buildings and facilities as part of its reclamation effort.

ARIX filed a motion requesting the court to separate its garnishment action from the DEQ's petition for a declaratory judgment. The district court granted ARIX's motion to separate and, in an order entered on May 21, 1990, found that the funds held by the DEQ were not subject to garnishment. In that same order, the district court found that a contract existed between the DEQ and Appellant regarding Appellant's performance bond. The court based its conclusion that a contract existed upon a series of letters exchanged between Appellant and the DEQ in which Appellant agreed to convert its $300,000 [1] reclamation bond from an irrevocable letter of credit to cash and to release the funds to the State subject to specific conditions. Appellant's release of the funds was expressly conditioned upon the State using the money, first, to pay for any remaining engineering and construction work done on the reclamation project; second, to pay any amounts owing on construction services; third, to pay ARIX for engineering services; and, finally, to return any excess funds to Appellant. The district court specifically enforced that part of the contract which required the DEQ to pay the amount owed by Appellant to ARIX for engineering services.

On April 27, 1990, the court held a hearing on the DEQ's petition for a declaratory judgment, with the significant issue being whether the DEQ could require Appellant to post a sufficient performance bond to ensure the costs of demolishing and removing the mine's buildings and facilities. In a declaratory judgment and order for a reclamation performance bond, the district court found that the DEQ could require Appellant to provide additional bonding for Appellant's remaining reclamation obligations, including demolition of the on-site structures. The court ordered Appellant to submit a detailed plan within sixty days, indicating which buildings it intended to demolish and the proposed future use for those buildings it intended to retain, or, in the alternative, to post a $4 million reclamation performance bond with the DEQ. Under either option, the order required that a bond of approximately $386,000 be posted to ensure revegetation of the land which had not been reclaimed as well as certain less costly contingency items, such as repairing drainage structures and dust control. However, if Appellant chose to post the $4 million bond, the $386,000 would be included in the $4 million.

The DEQ's method of estimating the costs of demolishing the mine's buildings was less than precise. Mark Moxley, a district supervisor for the DEQ's Land Quality Division, testified that he reached an estimate of Appellant's demolition costs by averaging the costs of demolishing the buildings on five trona mining operations with comparably sized structures. Mr. Moxley felt that his estimate of $3 million was within "20 or 30 percent" of the actual costs of demolishing the buildings at the mine site. In its order requiring Appellant to either post a $4 million bond [2] or propose a beneficial use for any retained buildings,

---

1. As previously noted, Appellant posted a bond of approximately $1.8 million when it received United States Steel's mining permit. At the time ARIX filed its complaint, the DEQ had reduced Appellant's bond to $300,000 in recognition of Appellant's partial reclamation of the mine site.

2. Apparently, the $4 million figure was composed of the $3 million for demolition costs plus other additional reclamation work and a fifteen percent contingency fee to cover site security and unforeseen expenses.

the court acknowledged Appellant's contention that some of the reclamation costs were unnecessarily high. To accommodate Appellant's objections, the court granted Appellant sixty days to provide a detailed cost analysis showing that the actual reclamation costs would be lower than those estimated by the DEQ.

Appellant's response to the court's order claimed that any obligations concerning the buildings were controlled by its permit and reclamation plan, neither of which required it to demolish the buildings. Although Appellant felt that it had no obligation to demolish the buildings, it still conformed to the court's request to demonstrate an acceptable postmining use for the buildings. Appellant described the present use of the buildings as essentially being storage space for mining machinery waiting to be sold. Rather than using the buildings in the future, Appellant hoped to sell the property, including the buildings and facilities. Appellant declined the court's invitation to submit an analysis showing that the DEQ's building demolition estimates were inaccurate. Instead, Appellant relied upon its argument, now repeated on appeal, that the district court was precluded from ordering an additional bond to be posted. The district court found that Appellant's proposed future use for the buildings was insufficient and ordered Appellant to post a $4 million bond.

The first issue we must consider is whether the WEQA and its rules and regulations grant the DEQ authority to impose reclamation and bonding requirements upon mine-site buildings which were built prior to the WEQA's enactment. Appellant contends that the WEQA's language is prospective, thus precluding the DEQ from imposing reclamation and bonding requirements on pre-WEQA facilities. As evidence that the WEQA is prospective, Appellant quotes Wyo.Stat. § 35–11–406(b) (Supp.1992), which provides in pertinent part: "The [mining permit] application shall include a mining plan and reclamation plan dealing with the extent to which the mining operation *will* disturb or change the lands *to be* affected." (Emphasis added.)

As with any statute, our primary consideration is discerning the Legislature's intent. *Belle Fourche Pipeline Company v. State*, 766 P.2d 537, 542 (Wyo.1988). Although this Court has not construed the particular mine reclamation provisions at issue in this case, we have previously interpreted other sections of the WEQA. *People v. Platte Pipe Line Company*, 649 P.2d 208 (Wyo.1982). In *Platte Pipe Line Company*, we noted that, as an environmental statute designed to protect the public, the WEQA is entitled to receive a liberal construction. *Id.* at 212 (citing *Woolley v. State Highway Commission*, 387 P.2d 667, 673 (Wyo.1963)). A liberal construction does not mean that we can force words out of their natural meaning but does permit us to give words a fair and reasonable interpretation so as to obtain the object for which the statute was designed. *Soles v. State*, 809 P.2d 772, 774 (Wyo.1991).

To better understand whether the WEQA even applies to pre-WEQA buildings and facilities, it is helpful to first briefly examine the Open Cut Land Reclamation Act (Reclamation Act), which governed surface mining reclamation prior to the WEQA's enactment. 1969 Wyo.Sess. Laws ch. 192, §§ 1–14. In 1969, the Legislature enacted the Reclamation Act as a means of curbing economic and environmental damage caused by surface mining in Wyoming. Under the Reclamation Act, surface mining operators were required to obtain a mining permit and to post a bond with the Commissioner of Public Lands to ensure the availability of sufficient funds for the reclamation of affected lands. The Reclamation Act also established obligations for surface mining operators to reclaim and restore the land, but it was criticized as being vague and having inadequate reclamation standards. Its ineffectiveness ultimately led to its repeal by the Legislature in 1973. 1973 Wyo.Sess.Laws ch. 250, § 3. *Belle Fourche Pipeline Company*, 766 P.2d at 546. *See also* Robert E. Brown, Comment, *Land Quality: The Regulation of Surface Mining Reclamation in Wyoming*, 9 LAND & WATER L.REV. 97, 107 (1974).

Repeal of the Reclamation Act did not mean that lands disturbed by open-cut mining could be left unreclaimed. Rather, the Legislature expanded and clarified the reclamation and conservation duties of surface mining operators by enacting the WEQA. 1973 Wyo.Sess.Laws ch. 250, § 1. In addition to establishing a new permitting and reclamation scheme, the WEQA contained several provisions which helped existing surface mining operators bridge the gap between the Reclamation Act and the WEQA. These provisions for existing mining operations provide us with valuable assistance in understanding whether the WEQA's reclamation requirements apply to preexisting operations or, as Appellant claims, to only operations conducted after the WEQA's enactment. Among those provisions is Wyo.Stat. § 35–11–401 (Supp. 1992), which provides in pertinent part:

(a) No mining operation or operation by which solid minerals are intended to be extracted from the earth shall be commenced after the effective date of the act, except in accordance with its requirements. It is recognized these measures are performed in the public interest and constitute an expense to the operator, *and while this act applies to all mining operations, no operator shall be compelled to perform at his own expense measures required under this act with respect to operations that were completed or substantially completed prior to the effective date of this act....*

(b) All surface or underground mining operations operating at the date of enactment of this statute shall have a period of one (1) year within which to fulfill the requirements of this act. This period may be extended at the discretion of the council if the administrator has been unable to review and evaluate all operations that are presently operating under a permit issued by the state land commissioner in compliance with the "Open Cut Land Reclamation Act of 1969[."]

(Emphasis added.)

The obvious inference to be drawn from subsection (a) is that those preexisting operations not completed or substantially completed were subject to the WEQA's requirements. Operation is defined in Wyo. Stat. § 35–11–103(e)(viii) (Supp.1992):

(viii) "Operation" means all of the activities, equipment, premises, *facilities, structures,* roads, rights-of-way, waste and refuse areas excluding uranium mill tailings and mill facilities, within the Nuclear Regulatory Commission license area, storage and processing areas, and shipping areas used in the process of excavating or removing overburden and minerals from the affected land or for removing overburden for the purpose of determining the location, quality or quantity of a natural mineral deposit or for the reclamation of affected lands[.]

(Emphasis added.) In this case, the facilities and structures were constructed prior to the WEQA's enactment, but the operation as a whole was not completed or substantially completed prior to the WEQA's effective date, July 1, 1973. United States Steel operated the mine prior to the WEQA's enactment and continued to actively mine iron ore at the site until 1983. Since the buildings were part of the mining operation and the operation was not completed or substantially completed prior to the WEQA's effective date, we conclude that the buildings are subject to the WEQA's requirements.

Section 35–11–401(b)'s one-year grace period merely reinforces the idea that the WEQA applies to preexisting operations. It would be illogical to grant operators a grace period for complying with the WEQA if the WEQA applied only to operations conducted after its enactment. The purpose of a grace period is, presumably, to temper the severity of adapting to new requirements. If the WEQA only applied to prospective mining operations, existing operators would be in the same position as new operators and would have no need for a grace period.

Appellant does not really contest the WEQA's application to pre-WEQA operations but argues that the WEQA's reclamation and bonding requirements are prospective even if other WEQA aspects may apply. Appellant's interpretation appears to contradict the very purpose of the WEQA.

The WEQA is designed to "enable the state to prevent, reduce and eliminate pollution; to preserve, and enhance the air, water and reclaim the land of Wyoming; to plan the development, use, reclamation, preservation and enhancement of the air, land and water resources of the state." Wyo.Stat. § 35–11–102 (1988). If we adopt Appellant's interpretation of the WEQA as not requiring reclamation of preexisting operations, Appellant could leave the buildings as empty shells if it so desired. Such a result would be inconsistent with the Legislature's stated intent to either reclaim or develop the land.

In addition to the general statutory purpose language, the WEQA contains specific evidence of the Legislature's intent to apply the reclamation requirements to preexisting operations which were not completed or substantially completed prior to its enactment. Wyo.Stat. § 35–11–402(a)(vii) (Supp.1991)[3] provided:

(a) The council shall, upon recommendation by the advisory board, establish rules and regulations pursuant to the following reclamation standards for the affected areas, including but not limited to:

. . . .

(vii) In administering established rules and regulations on such standards the administrator and advisory board shall consider all the facts and circumstances bearing upon any reclamation plan. In consideration of reclamation plans for any mining operation that is presently being conducted in the state under a permit issued by the state land commission under the "Open Cut Land Reclamation Act of 1969[,"] particular attention shall be paid to:

(A) The social and economic value of the product mined;

(B) The technological availability for economic feasibility of reclaiming the affected area[.]

Section 35–11–402(a)(vii) fully indicated that the Legislature intended to require reclamation of some preexisting operations. When considering a reclamation plan for an operation presently being conducted under a Reclamation Act permit, the administrator must pay particular attention to certain social, economic, and technological variables. This added attention is paid only to reclamation plans submitted by Reclamation Act permittees. It would be illogical to make special concessions for those reclamation plans which concern operations being conducted after the WEQA's enactment. Presumably, the added considerations in § 35–11–402(a)(vii) were meant to reduce the harshness of complying with the WEQA's new reclamation requirements. If the reclamation plans referenced in § 35–11–402(a)(vii) did not apply to preexisting operations and applied only to new operations, no need to grant special consideration to Reclamation Act permittees would exist because the reclamation burdens would be the same as those of any new operator. Section 35–11–402(a)(vii)'s language reinforced this interpretation. That paragraph discussed the reclamation plan for any mining operation "presently being conducted" and the economic feasibility of reclaiming the "affected area." Both phrases apply to operations already in existence at the time the WEQA was enacted.

Appellant also argues that the WEQA's bonding provisions provide evidence that the WEQA is not applicable to preexisting facilities. The WEQA's primary bonding provision is Wyo.Stat. § 35–11–417 (Supp. 1992), which provides in pertinent part:

(a) The purpose of any bond required to be filed with the administrator by the operator shall be to assure that the operator shall faithfully perform all requirements of this act and comply with all rules and regulations of the board made in accordance with the provisions of this act.

. . . .

(c) The amount of any bond to be filed with the administrator prior to commencing any mining shall be:

(i) For an initial bond the amount equal to the estimated cost of reclaiming the affected land disturbed and

---

**3.** Amended by 1992 Wyo.Sess.Laws ch. 60, § 3     effective April 1, 1992.

restoring, as defined in W.S. 35–11–103(f)(iii), any groundwater disturbed by in situ mining during the first year of operation under each permit. . . .

(ii) For renewal bonds the amount equal to the estimated cost of reclaiming the land to be disturbed during the renewal period, and the estimated cost of completing reclamation of unreleased lands and groundwater disturbed during prior periods of time. The estimated cost shall be based on the operator's cost estimate, which shall include any changes in the actual or estimated cost of reclamation of unreleased affected lands, plus the administrator's estimate of the additional cost to the state of bringing in personnel and equipment should the operator fail or the site be abandoned.

Other bonding provisions include Wyo. Stat. § 35–11–403(a)(ii) (Supp.1992) which authorizes the Land Quality Division's administrator "[t]o fix the amount of, collect, maintain and otherwise comply with the statutory performance bond requirement set out in W.S. 35–11–417." *See also* Wyo. Stat. § 35–11–110(a)(ii) (Supp.1992).

In our view, both § 35–11–403(a)(ii) and § 35–11–417(c)(ii) authorize the administrator to require a bond to ensure the reclamation of pre-WEQA buildings and facilities. As Appellant accurately points out, the statute does not refer to determining a bond amount on the basis of the costs of demolishing buildings which predate the WEQA. However, to be consistent with the rest of the WEQA, the broad statutory language must be read as allowing such a bond to be required. The WEQA clearly contemplated the reclamation of those operations not completed or substantially completed prior to the WEQA's enactment. If the WEQA were designed, at least in part, to reclaim preexisting operations, that goal would be severely impeded by the lack of a bonding requirement. Performance bonds provide an incentive for operators to complete reclamation and also provide financing for reclamation costs in forfeiture cases. Essentially, the bonding requirement is what makes the reclamation system work, so it would have been incongru-ous for the Legislature to require reclamation but not bonding for pre-WEQA operations.

Having determined that the WEQA's reclamation and bonding requirements apply to preexisting operations, we must now examine the duty imposed by the WEQA upon operators to reclaim their buildings and structures. The WEQA's sole reference to buildings is in § 35–11–406(b)(iv), which requires the reclamation plan to include the "[m]ethod of disposal of buildings and structures erected during the operation." The Land Quality Division's rules and regulations offer further insight into what an operator is required to do with mine-site buildings and structures. Prior to September 1986, the rules and regulations stated in pertinent part:

b. In addition to that information required by W.S. 35–11–406(b), each application for a mining permit shall contain:

. . . .

(3) A plan whereby the operator will reclaim the affected lands to the proposed postmining land use in accordance with Chapter IV, Section 2a. which shall include:

. . . .

(h) A plan for the disposal of buildings and structures in accordance with the requirements of Chapter IV, Section 2.k.

Chapter II, Section 2.b(3)(h) (1985).

k. Disposal of buildings and structures.

(1) All buildings and structures must be removed or dismantled unless it can be demonstrated to the administrator's satisfaction that the buildings or structures will be of beneficial use in accomplishing the proposed use of the land after reclamation or for environmental monitoring.

Chapter IV, Section 2.k(1) (1985). The rules and regulations regarding disposal of buildings were modified in September 1986 to require that mining permit applications include:

(H) A plan for the disposal of buildings and structures *erected, used or*

*modified* by the applicant in accordance with the requirements of Chapter IV, Section 2.(k).

Chapter II, Section 2(b)(iii)(H) (1986) (emphasis added).

(k) Disposal of buildings and structures.

(i) All buildings and structures *constructed, used or improved* by the operator must be removed or dismantled unless it can be demonstrated to the administrator's satisfaction that the buildings or structures will be of beneficial use in accomplishing the proposed use of the land after reclamation or for environmental monitoring.

Chapter IV, Section 2(k)(i) (1986) (emphasis added).

■ Some dispute between the parties exists concerning which version of the rules and regulations applies. In its brief, the State relies upon the more recent language, while Appellant contends that the older language should apply. The newer language is applicable to all mining operations "commenced or conducted" after the effective date of the rules and regulations. Chapter I, Section 3(a) (1986). Since active mining ceased in 1983, the determination of which version applies depends upon whether Appellant's reclamation efforts constitute mining operations. We perceive no need to decide this question because, pursuant to either version of the rules and regulations, mine operators are required to remove or dismantle the buildings unless they will be put to a beneficial use consistent with the proposed use of the land. The language added in 1986 merely limits the buildings which must be dismantled, a concept which would appear, if anything, to potentially benefit, not hinder, Appellant. Thus, we conclude that the WEQA, as supplemented by the Land Quality Division's rules and regulations, requires Appellant to either reclaim the buildings or put them to a beneficial use.

■ The only question remaining is whether Appellant could be required to post a bond for the buildings' demolition if the DEQ consistently approved reclamation plans for the mine site which did not require the operator to remove or demolish the buildings. Appellant maintains that, by excluding reclamation and removal of the buildings from the bond and the reclamation plans between 1973 and 1989, the DEQ demonstrated its long-standing interpretation of the WEQA as not requiring pre-WEQA buildings to be reclaimed. Appellant urges this Court to defer to the agency's long-standing interpretation. *WYMO Fuels, Inc. v. Edwards,* 723 P.2d 1230, 1237 (Wyo.1986). Contrary to Appellant's claim, we do not think that the DEQ interpreted the statute as excluding reclamation and bonding requirements for the buildings. Instead, we detect a pattern of carelessness by the DEQ in approving reclamation plans which did not specifically state what would be done with the buildings once mining ceased.

United States Steel, Appellant's predecessor, only briefly mentioned the mine's buildings in its first reclamation plan submitted in 1974:

The buildings associated with operations are all located on fee ground owned by U.S. Steel and are of substantial construction. It is possible that beneficial use can be made of these buildings following completion of operations. Those buildings for which there is no beneficial use will be dismantled and salvaged. Since buildings and ground are both owned by United States Steel, final disposition decisions should remain with United States Steel.

When Appellant acquired the mine in 1985, the DEQ required a new reclamation plan as a condition of the permit transfer. In November 1985, Appellant complied with the DEQ's condition by submitting a proposed reclamation plan which identified certain buildings to be removed and others to remain. Appellant subsequently submitted a proposed permit revision application and reclamation plan which suggested disposing of the buildings in the same manner as the first plan but added: "The use of the facilities to remain has not yet been determined." Appellant's final, approved reclamation plan dealt with the buildings by proposing to "[m]aintain [the facilities] as is for future commercial/industrial use."

An internal DEQ memorandum written to the file said: "The mine facilities area will be left intact in hopes of serving a future industrial or commercial use."

The trial court found that Appellant's approved reclamation plan assumed that the buildings remaining in the permit area would not be demolished but instead would be put to commercial use. We agree with the trial court's assessment. Both United States Steel's and Appellant's reclamation plans indicated an intent to put the buildings to future beneficial use. The internal memorandum evidences the DEQ's belief that the buildings would be put to a beneficial postmining use and that they did not need to be reclaimed. Thus, we conclude that the DEQ's long-standing failure to include the costs of building demolition in the mine's bonding and reclamation requirements was due to an assumption that the buildings would be put to beneficial use, not that the buildings did not have to be reclaimed.

We recognize the perception that it is manifestly unfair for the DEQ to require a reclamation bond of approximately $1.8 million, to reduce that bond to $300,000 after Appellant partially reclaimed the mine, and then to increase the bond to $4 million. The perception of injustice is not entirely accurate. After the DEQ became concerned that Appellant might abandon the mine's buildings, the DEQ sought a declaratory judgment to determine Appellant's obligation to reclaim the buildings or put them to a beneficial use. The court's declaratory judgment allowed Appellant to remove the buildings from the WEQA's reclamation and bonding provisions by providing a detailed plan for the buildings' future use. Appellant did not provide an adequate plan explaining the buildings' future use. The failure to supply an adequate plan meant that Appellant was required to post a $4 million bond. A $4 million bond appears inequitable especially in light of Mr. Moxley's testimony that his estimate was within "20 or 30 percent" of the actual demolition costs; i.e., perhaps a million dollars off. Although $4 million is obviously somewhat speculative, the court's declaratory judgment stated: "[Ap-

pellant] has the right to initially establish the amount of the reclamation performance bond by competent engineering analysis, the report of which is subject to review and approval by the Land Quality Administrator." Appellant chose not to submit a proposed bond amount. Even though we may be frustrated by the high bonding requirement, it was Appellant's responsibility to provide the court with a more accurate estimate, and it chose not to provide such an estimate.

■ In its second issue, Appellant contends that the district court was precluded from determining that reclamation at the mine was not complete. Appellant's argument is related to ARIX's summary judgment against Appellant for engineering services. After obtaining its summary judgment against Appellant, ARIX sought to garnish Appellant's reclamation bond being held by the DEQ. The district court found that the bond was not subject to garnishment. However, the court did find that a contract existed between the DEQ and Appellant regarding Appellant's reclamation bond and that, pursuant to the contract, the DEQ was required to pay ARIX the amount owed to it by Appellant. The contract between the DEQ and Appellant consisted of a series of letters between the two in which Appellant agreed to convert the form of its reclamation bond from an irrevocable letter of credit to cash and to release the funds to the DEQ subject to certain conditions. Among the conditions was the proviso that the DEQ would pay ARIX for engineering services only after it paid the costs of any remaining reclamation work. The district court ordered the DEQ to specifically perform that part of the contract which required that ARIX be paid the money owed to it by Appellant. Appellant now argues that, by ordering the payment of the past due amounts to ARIX, the trial court must necessarily have found that all reclamation had been completed because ARIX was to be paid only after all reclamation was completed.

Appellant's argument is inconsistent with the trial court's subsequent declaratory judgment, in which the court stated:

By its Order for Specific Performance of Contract dated May 21, 1990, by which the [DEQ] was ordered to pay $99,201.85 to ARIX Corporation (the project engineer) to complete payment for its engineering services, the Court did not make findings regarding the obligations of [Appellant] for final reclamation of the Atlantic City Iron Mine as governed by Permit to Mine Number 231C; instead, the Court reserved such determinations for further order in this case.

Consistent with the foregoing finding, the court required Appellant to post a bond to ensure the completion of several additional items, such as revegetation and drainage control. The combination of the court's specific statement regarding Appellant's reclamation obligations and its order for Appellant to post a bond for additional reclamation leads to the inescapable conclusion that the court's order for specific performance was not a determination that all reclamation had been completed.

■ In a related argument, Appellant claims that, pursuant to the doctrine of equitable estoppel, the DEQ is estopped from requesting any additional reclamation activity. Appellant's argument for invoking the doctrine of equitable estoppel is twofold: First, the DEQ consistently represented to Appellant that the $300,000 bond would be sufficient to complete all remaining reclamation activities. Appellant relied upon this representation when it changed its irrevocable letter of credit to cash and gave the funds to the DEQ. Second, when the district court ordered the DEQ to pay ARIX, it necessarily determined that all reclamation activities had been completed. According to Appellant, the DEQ's failure to appeal the district court's order represented to Appellant that all reclamation activities had been completed and that the DEQ should now be estopped from asserting otherwise.

To support its claim of equitable estoppel against the DEQ, Appellant relies upon this Court's statement in *Seaman v. Big Horn Canal Association*, 29 Wyo. 391, 398, 213 P. 938 (1923): "[O]ne who by his acts or representations intentionally or through culpable negligence induces another to believe certain facts to exist, and the latter, not knowing the facts, acts on such belief to his substantial prejudice, the former is, in equity, estopped to deny the existence of such fact." In more recent cases, we have said that equitable estoppel requires some misrepresentation and is generally applied to prevent fraud, either constructive or actual. *B & W Glass, Inc. v. Weather Shield Mfg., Inc.*, 829 P.2d 809, 813 (Wyo.1992); *Squaw Mountain Cattle Company v. Bowen*, 804 P.2d 1292, 1297 (Wyo.1991). Equitable estoppel against a governmental agency requires even more egregious conduct.

Equitable estoppel should not be invoked against a government or public agency functioning in its governmental capacity, except in rare and unusual circumstances and may not be invoked where it would serve to defeat the effective operation of a policy adopted to protect the public.

*Big Piney Oil & Gas Company v. Wyoming Oil and Gas Conservation Commission*, 715 P.2d 557, 560 (Wyo.1986), *quoted in State ex rel. Wyoming Workers' Compensation Division v. Rivera*, 796 P.2d 447, 450 (Wyo.1990), *and in Sare v. Sheridan County Board of County Commissioners*, 784 P.2d 593, 595 (Wyo.1989).

In this case, the DEQ was functioning within its governmental capacity of ensuring the mine's reclamation. We discern no rare and unusual circumstances which support invoking equitable estoppel against the DEQ. When the DEQ reduced Appellant's reclamation bond to $300,000, it obviously considered that amount as being sufficient to complete the remaining reclamation requirements at the mine. In the ensuing letters between Appellant and the DEQ in which Appellant agreed to release its funds to the DEQ, both parties assumed that $300,000 would satisfy the additional reclamation costs. We can find no evidence in the record, and Appellant offers no evidence, to indicate that the DEQ misrepresented the reclamation costs.

Appellant's second ground for equitable estoppel is that, by not appealing the trial

court's order for specific performance, the DEQ represented to Appellant that all reclamation activities had been completed. Appellant's contention that the DEQ's failure to appeal constituted a representation to Appellant seems tenuous at best and certainly does not give rise to grounds for equitable estoppel.

Affirmed.

URBIGKIT, Justice, concurring in part and dissenting in part.

It is recognized that stream pollution problems are potentially involved in this appeal. In consideration of the present partial performance status of the reclamation activities, forcefully discussed in current news reports, the need for urgency in our appellate decision is apparent.

In recognizing that need, I concur with the court's decision in general direction, but dissent in part with concern that we ask for the impossible which, if true, will not be achieved. I also dissent because no proper basis is presented to require the bond at the amount stated for building removal and structure site renovation or that a bond should presently be required to remove the structures constituting office and processing facilities.

It seems completely clear that a use for the buildings has been considered and may probably be pursued by a reasonably early date. Under that circumstance, a punitive bond in the amount provided is not justified by anything found in the Department of Environmental Quality rules, regulations or executed agreements entered into by the department with either the predecessor, United States Steel Corporation, or the present appellant. There is a punitive, perspective imposition, unexpectedly created, for this major cost responsibility to appellant. *Hercules Powder Co. v. State Bd. of Equalization,* 66 Wyo. 268, 208 P.2d 1096 (1949). *See also People v. Platte Pipe Line Co.,* 649 P.2d 208 (Wyo.1982).

I generally agree with the direction of the decision that appellant retains a reclamation maintenance responsibility for areas of dams, ponds and other facilities originally involved in mining where stream damage may occur from moisture flow. The $386,000 bond for revegetation and other restorative activities is justified, but I would not go further to require the total bond of $4 million. If we do, it is as likely as not that even a $386,000 bond will be an unrealistic expectation.

I join in affirming the decision of the trial court, except with the administrative agency's increase of the reclamation bond to a sufficient total covering the cost of building demolition and site renovation. It is concluded that the additional imposition by the agency is unauthorized, *Roberts Const. Co. v. Vondriska,* 547 P.2d 1171 (Wyo.1976), and this court's decision in approval cannot be factually and legally supported in this appellate record. *Platte Pipe Line Co.,* 649 P.2d 208; *Holding's Little America v. Board of County Com'rs of Laramie County,* 670 P.2d 699 (Wyo.1983), *appeal after remand* 712 P.2d 331 (Wyo.1985); *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization,* 749 P.2d 221 (Wyo.1987).

Consequently, I concur in the requirement for the general reclamation bond and dissent to the additional inclusion of the building structure demolition and site renovation costs.